IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:22-CR-96-TAV-JEM |
| | ) | |
| MALIK M. SCOTT-BOYNTON, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This case is before the Court for report and recommendation on Defendant Malik Scott-Boynton's Motion to Suppress and Memorandum of Law in Support [Doc. 34]. *See* 28 U.S.C. § 636(b). Defendant is charged by Indictment with conspiring to distribute and possess with intent to distribute heroin (Count One) and fentanyl (Count Two) from June 1, 2022, through September 14, 2022, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 [Doc. 20]. These charges arise out of the search of the vehicle Defendant was driving and of two apartments in Knoxville, Tennessee. Defendant moves the Court to suppress the evidence seized from the search of an apartment on North Cedar Bluff Road [Doc. 34].

On September 14, 2022, as officers prepared to execute a search warrant for an apartment on Grayland Drive, they observed Defendant Scott-Boynton leave the Grayland Drive apartment and enter a vehicle on which they had a tracking device. Law enforcement surreptitiously followed Defendant to an apartment on North Cedar Bluff Road. Officers conducted surveillance on the apartment and arrested Defendant after he exited the apartment, locked it with a key, and walked toward his vehicle. Officers then performed a protective sweep of the apartment during which they viewed evidence of narcotics packaging. Officers obtained a search

warrant for the Cedar Bluff Road apartment, using information gained during the sweep along with information from the preceding investigation and search of the Grayland Drive apartment. Defendant argues that the warrantless sweep of the Cedar Bluff Road apartment violated his Fourth Amendment rights and, in the absence of the evidence viewed during the sweep, probable cause for a search warrant does not exist. Defendant asks the Court to suppress the evidence seized from the Cedar Bluff Road apartment during the execution of a search warrant.

After reviewing the evidence, the arguments of the parties, and the relevant law, the Court finds the protective sweep of the Cedar Bluff Road apartment violated the Fourth Amendment. The Court, however, finds the search warrant for the apartment is valid under the independent-source and inevitable-discovery doctrines. The Court also finds that the executing officers relied on the search warrant for the Cedar Bluff Road apartment in good faith, and thus, the exclusionary rule should not apply. The Court therefore recommends that Defendant's motion to suppress be denied.

I.  **SUMMARY OF THE EVIDENCE**

The parties appeared before the undersigned on January 9, 2023, for an evidentiary hearing on Defendant's motion to suppress. Assistant United States Attorney Alan Scott Kirk appeared on behalf of the Government. Attorney Patrick E. Nyenhuis represented Defendant Scott-Boynton, who was also present.

At the evidentiary hearing, the Government presented the testimony of Knoxville Police Department ("KPD") Task Force Officer Todd Strickenberger ("TFO Strickenberger"), who testified that he has worked for the KPD for twenty years. He has worked in the Organized Crime Unit since 2018 and has served as a task force officer with the Bureau of Alcohol,

Tobacco, and Firearms ("ATF") for four years.  TFO Strickenberger has investigated numerous drug conspiracies and drug trafficking organizations ("DTOs") over the last four to five years.

Beginning in July 2021, TFO Strickenberger assisted in the investigation of a drug conspiracy involving Raymond Williams.  TFO Strickenberger stated this was a Detroit-based DTO that trafficked primarily heroin and fentanyl and dealt these substances out of rental cars to customers in the West Knoxville area.  He said Williams traveled between Detroit and Knoxville by airplane or vehicle.  Following the execution of a search warrant in May 2021, law enforcement arrested Williams, Kanaya Harris, and Harold Scott.  Williams, Harris, and Scott were charged in Knox County with the sale and delivery of heroin and possession of a firearm and were released on bond.  TFO Strickenberger stated that throughout the investigation, Harold Scott was seen traveling in Knoxville in rental cars.

TFO Strickenberger stated that on September 14, 2022, law enforcement executed a search warrant at an apartment in the Brandon Park apartment complex at 9112 Grayland Drive ("the Grayland Drive apartment").  The officers seized currency but no narcotics from the Grayland Drive apartment and arrested a conspirator, Brian Rogers.  TFO Strickenberger said just before the execution of this search warrant, officers observed Malik Scott-Boynton leaving the Grayland Drive apartment.  Surveillance officers saw Scott-Boynton go to an apartment at the Metropolitan apartment complex on 790 North Cedar Bluff Road ("the Cedar Bluff Road apartment"), which is approximately two miles from the Grayland Drive apartment.

TFO Strickenberger testified that Defendant Scott-Boynton was arrested as he exited the Cedar Bluff Road apartment and then KPD officers performed a safety sweep of the apartment. The Government played a video recording from the body camera of an officer involved in the sweep starting at the five minute and forty-five second mark [Exh. 1].  The Government also

3

played a video recording from the body camera of another officer involved in the sweep starting at the six minute and fifteen second mark [Exh. 2]. TFO Strickenberger stated he was present outside the apartment during the safety sweep and did not participate in the sweep.

TFO Strickenberger said the officers performed the safety sweep because he told them that two known conspirators and one unknown conspirator remained at large. These three conspirators had been seen coming and going from the Cedar Bluff Road apartment on numerous occasions throughout the investigation. TFO Strickenberger said, additionally, Officer Chip Bruner thought he saw movement of a curtain or something near the window inside the apartment. He said a third reason for the safety sweep was that coconspirators Raymond Williams and Harold Scott have lengthy, violent criminal histories, and a loaded firearm was seized in the May 2021 search. He also stated that Scott had been seen in Knoxville the preceding week.

TFO Strickenberger stated that officers believed they had sufficient probable cause for a search warrant for the Cedar Bluff Road apartment before they conducted the safety sweep, and they had already decided to seek a search warrant before the sweep commenced. He said the officers performed the safety sweep to ensure that they would not be attacked by an armed individual when executing that search warrant.

On cross-examination, TFO Strickenberger acknowledged that Officer Matt Smith removed his bulletproof vest at the two minute and fifty second mark on the video recording [Exh. 2]. TFO Strickenberger said he was not present at the Grayland Drive apartment when officers saw Scott-Boynton leave in a red Jeep. He agreed that law enforcement tracked the Jeep to the Cedar Bluff Road apartment using a GPS tracker. Officers followed the Jeep and watched

4

Scott-Boynton enter the apartment. Scott-Boynton was the sole occupant of the Jeep and entered the apartment alone.

TFO Strickenberger said he was not on the scene when Scott-Boynton was arrested. He did not know when Officer Bruner arrived. TFO Strickenberger said Officer Bruner told him that Bruner thought he saw movement inside one of the apartment windows. TFO Strickenberger denied that anyone told him they saw lights turn on or off, heard noise from the apartment, saw other people in the apartment, or heard Scott-Boynton call out to someone when arrested. He said none of the other officers said they heard people walking around, a door close or open, a dryer or dishwasher running, a toilet flush, or water running.

TFO Strickenberger testified that after Scott-Boynton was arrested, he was searched and placed in the back of a patrol car. No narcotics were found on Scott-Boynton's person at the time of this initial search. TFO Strickenberger said after the protective sweep and before Scott-Boynton was transported to jail, officers seized narcotics from Scott-Boynton's person. TFO Strickenberger agreed that at the time he applied for the search warrant, he did not call the DTO an "ADTO," which is an armed drug trafficking organization, although that name applied.

TFO Strickenberger stated that as part of the investigation of the DTO, law enforcement tracked several vehicles that went to the Cedar Bluff apartment and remained there for fifteen minutes to one hour. During his prior surveillance of the Cedar Bluff apartment, TFO Strickenberger never saw multiple people enter the apartment at once. He agreed that Scott-Boynton has no criminal history and is not associated with weapons. TFO Strickenberger observed, however, that Scott-Boynton associates with others who have criminal histories and are known to be armed. He agreed that if he were to remove his bulletproof vest, it would be because he thought it was safe to remove it, but he could not speak for another officer. TFO

5

Strickenberger stated that Officer Smith, the officer who removed his vest on the video, did not enter the apartment and was responsible for photographing evidence.

TFO Strickenberger said the search warrant for the Cedar Bluff apartment was executed on September 14. He agreed that his affidavit in support of that search warrant first mentions the Cedar Bluff apartment at paragraph 31. He also agreed that he did not include in his affidavit information that an officer saw movement in the apartment prior to the protective sweep. Nor did he include that he was concerned that someone would attack during the execution of the search warrant. TFO Strickenberger identified a summary of the execution of the search warrant on page nine of his ATF Report [Exh. 3]. He agreed that he also did not include information about an officer seeing movement in the apartment or the officers' fear of an attacker in this report. He agreed his report does not contain information indicating that another person was in the apartment.

On redirect examination, TFO Strickenberger said ATF TFO Matthew Smith was designated to photograph the search of the Jeep. TFO Smith did not enter the apartment during the protective sweep. In addition to the testimony of TFO Strickenberger and the two video recordings, the Government also relied on the affidavits supporting the search warrants for the Grayland Drive apartment [Doc. 34-1] and the Cedar Bluff Road apartment [Doc. 34-2].

Upon hearing this evidence and the parties' arguments on the motion, the Court took the matter under advisement.

## II. FINDINGS OF FACT

Based upon the testimony of TFO Strickenberger and the exhibits, the Court makes the following factual findings.

In the late spring and early summer of 2021, the KPD was investigating a DTO that traveled from Michigan to Tennessee to traffic heroin in the Knoxville area. On May 24, 2021, the KPD executed a search warrant at an apartment on South Gallaher Road, seized fifty grams of suspected heroin, a loaded firearm, drug manufacturing components, and currency. Officers arrested three individuals found inside the apartment: Raymond Williams, who was believed to be the leader of the DTO, Kanaya Harris, and Harold Scott. These three were charged with the sale and delivery of heroin in Knox County and released on bond. The Gallaher View apartment was rented in the name of John Rubin of Atlanta, Georgia, but officers believed this to be a false name.

In June 2022, law enforcement learned that Raymond Williams was still dealing narcotics in Knoxville, Tennessee. Using confidential informants, surveillance, and vehicle tracking devices, law enforcement determined that the DTO used rental vehicles and conducted drug transactions in the parking lots of apartment complexes in the West Knoxville area. By conducting traffic stops on the target vehicles, officers identified Brian Rogers and Malik Scott-Boynton as members of the DTO. In September 2022, law enforcement determined that the DTO had relocated to the Grayland Drive apartment as their new base of operations. On September 14, 2022, ATF and KPD officers executed a federal search warrant at the Grayland Drive apartment, seized a large sum of currency and approximately one ounce of marijuana, and arrested Rogers, who was found inside the Grayland Drive apartment.

Just before the execution of the search warrant for the Grayland Drive apartment, officers observed Defendant Scott-Boynton leave the Grayland Drive apartment and drive away in a burgundy Jeep Cherokee with a previously installed tracking device. Officers followed Defendant to the Cedar Bluff Road apartment. Law enforcement had observed Defendant and

other members of the DTO coming and going from the Cedar Bluff Road apartment in vehicles with tracking devices multiple times per day over the preceding two months. On September 14, 2022, Defendant entered the Cedar Bluff Road apartment alone and remained there for one hour. During that time, law enforcement surveilled the apartment and saw no one else enter or leave. After one hour, Defendant left the apartment, locked the door with a key, and walked toward the Jeep. Law enforcement arrested Defendant near the Jeep. While being transported to jail, Defendant admitted having drugs hidden in his groin, and two ounces of suspected heroin, packaged in one-gram quantities, was seized from Defendant's person.

TFO Strickenberger, the affiant on the search warrant for the Grayland Drive apartment, was on the scene at the Cedar Bluff Road apartment following Defendant's arrest. TFO Strickenberger had determined he would seek a search warrant for the Cedar Bluff Road apartment. KPD Officer Scott Brunner told TFO Strickenberger that he thought he saw movement by the window of the apartment. The officers decided to perform a protective sweep of the apartment to confirm no armed individuals were in the apartment so they could safely execute the anticipated search warrant. While the officers organized to perform a protective sweep, TFO Matthew Smith, who was designated to photograph the search of the Jeep, removed his bulletproof vest.

A team of five officers performed a protective sweep of the Cedar Bluff Road apartment. Officers observed drug packaging paraphernalia, including a kilogram press, during the safety sweep but did not find any other people in the apartment. The officers secured the apartment while TFO Strickenberger obtained a federal search warrant to search the Cedar Bluff Road apartment. TFO Strickenberger included the items viewed during the protective sweep as part of the probable cause for the search warrant. TFO Strickenberger's affidavit also stated that the

8

Case 3:22-cr-00096-TAV-JEM   Document 60   Filed 02/10/23   Page 8 of 20   PageID #: 307

Cedar Bluff Road apartment was leased to John Rubin, which is the same fictitious name used by the DTO to rent the Gallaher View Road apartment, searched on May 24, 2021. Officers executed the search warrant for the Cedar Bluff Road apartment and seized the items viewed during the protective sweep.

## III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant Scott-Boynton argues that the protective sweep of the Cedar Bluff apartment was unreasonable and violated his Fourth Amendment rights. He further argues that neither the inevitable discovery doctrine nor the independent source doctrine cure the warrantless sweep and, thus, all evidence seized from the Cedar Bluff Road apartment must be suppressed.[1] The Court examines each of these issues along with the Government's assertion that the good faith exception applies in this case. For the reasons set forth below, the Court finds the protective sweep violated the Fourth Amendment. The Court, however, also finds the search of the apartment was constitutional because the search warrant affidavit contains independent probable cause without considering the evidence from the sweep and law enforcement would have inevitably seized the evidence from the Cedar Bluff Road apartment pursuant to a valid search warrant. In addition, the exclusionary rule does not apply because the executing officers acted in good-faith reliance on the search warrant.

### A. Protective Sweep

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory

---

[1] In his reply brief, Defendant also addresses the exigent circumstances exception [*See* Doc. 54 pp. 5–6]. The Government, however, has not asserted that it applies here, and therefore, the Court does not address it.

9

visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). "The Supreme Court has identified two types of warrantless protective sweeps of a residence that are constitutionally permissible immediately following an arrest." *United States v. Archibald*, 589 F.3d 289, 295 (6th Cir. 2009). The first type of warrantless protective sweep permits an officer to, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Buie*, 494 U.S. at 334.

The Court finds that the search of the Cedar Bluff Road apartment does not qualify under this type of protective sweep. Defendant exited the Cedar Bluff Road apartment, closed the door, locked it, and walked toward his vehicle. Officers then arrested Defendant, searched him, and placed him in the back of a patrol car. Hence, the apartment was not "immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334. *Cf. United States v. Perry*, No. 09-20324, 2011 WL 184014, at *8 (W.D. Tenn. Jan. 19, 2011) (finding protective sweep of room warranted where the defendant "was arrested in the hall just outside her room" and the door to the room was open), *aff'd*, 703 F.3d 906 (6th Cir. 2013) (abrogated on other grounds).

The second type of protective sweep permits an officer to search beyond immediately adjoining areas, provided that the officer can show that he or she "possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Buie*, 494 U.S. at 334. (internal citations and quotation marks omitted). Such a sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. Further,

10

because it is not a full search, the sweep must "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36.

Even though officers arrested Defendant outside the Cedar Bluff Road apartment, it does not mean that a protective sweep of the Cedar Bluff Road apartment is per se unconstitutional. The Sixth Circuit has "decline[d] to adopt a bright-line rule that prohibits police officers from conducting a protective sweep of a home every time they arrest a defendant outside that home, regardless of the potential danger from persons inside." *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996) (footnote omitted) (finding that a protective sweep was not proper where the defendant was in custody outside of his girlfriend's apartment, law enforcement had no reason to believe that other individuals were inside of the apartment and posed a danger to law enforcement, and the only justification claimed by the officers was that the girlfriend ran outside in a "hostile rage"). Rather, to justify the sweep, an officer must show that he or she had reasonable suspicion based on specific, articulable facts causing the officer to believe that the area to be swept concealed a person, who presents a danger to the officer or others. *Buie*, 494 U.S. at 334; *see also Colbert*, 76 F.3d at 776.

That was not the case here. The Government relies upon the statement of Officer Bruner, who told TFO Strickenberger that he thought he saw movement inside one of the Cedar Bluff Road apartment windows. Yet, the record contains facts that belie Officer Bruner's statement and demonstrate that the officers did not have specific and articulable facts here to justify the protective sweep. No officer on the scene saw lights turn on or off inside the apartment, heard noise from inside the apartment, saw other people in the apartment, or heard Defendant callout to someone when he was arrested outside of the apartment. Further, while officers had seen

11

members of the DTO coming and going from the Cedar Bluff Road apartment in vehicles with tracking devices multiple times per day over the preceding two months, on the date of the protective sweep, Defendant entered the Cedar Bluff Road apartment alone and remained there for one hour. During this time, officers conducted surveillance on the Cedar Bluff Road apartment and saw no one else enter or leave the Cedar Bluff Road apartment. Rather, after an hour, Defendant left the apartment alone, locked the door with a key, and walked toward the Jeep where he was arrested. Indeed, one officer on the scene designated to photograph the Jeep removed his bulletproof vest. At best, then, the officers were uncertain about whether others were present inside the Cedar Bluff Road apartment,[2] but that "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." *Id*. at 778. Nor may officers "justify a protective sweep solely on the ground that the arrested individual was suspected of drug dealing." *Perkins v. United States*, 127 F. App'x 830, 836 (6th Cir. 2005) (citing *United States v. Hatcher*, 680 F.2d 438, 442 (6th Cir. 1982)).

Accordingly, the Court finds that the protective sweep was not justified by specific and articulable facts that reasonably warranted the officers in believing that the Cedar Bluff Road apartment harbored an individual posing a danger to the officers or others. By sweeping the Cedar Bluff Road apartment, therefore, the officers violated Defendant's Fourth Amendment right to be free from unreasonable searches.

**B.      Independent-Source and Inevitable-Discovery Doctrines**

Given that the protective sweep of the Cedar Bluff Road apartment was unlawful, the question remains whether the search warrant for that apartment provided a lawful mechanism for

---

[2] The Government's argument that two known conspirators and one unknown conspirator remained at large at the time of the sweep adds no substance to the officers' speculation regarding the presence of others in the apartment. The officers were still, at best, unsure of whether the apartment contained other people.

12

searching it. In making that assessment, the parties have argued whether the independent-source doctrine or the inevitable-discovery doctrine applies in this case. Because they are related, and because the parties' arguments about application of these doctrines overlap, the Court addresses them here together. As explained below, the Court finds that, after removing the observations obtained during the protective sweep from the search warrant, sufficient evidence remains in the search warrant affidavit to support a finding of probable cause.

Under the independent-source doctrine, "evidence will be admitted it the government shows that it was discovered through sources 'wholly independent of any constitutional violation.'" *United States v. Jenkins*, 396 F.3d 751, 757 (6th Cir. 2005) (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). For this doctrine to apply, "the government must make two showings by a preponderance of the evidence: (1) the initial illegal search did not prompt officers to seek a warrant for a second search, and (2) a neutral magistrate would have issued the search warrant even if never presented with the illegally obtained information." *United States v. Duncan*, No. 5:20-49-KKC-MAS, 2020 WL 5801079, at *5 (E.D. Ky. Sept. 29, 2020) (citations omitted). A related doctrine, the inevitable-discovery doctrine, "applies when . . . evidence discovered during an illegal search would have been discovered during a later legal search and the second search inevitably would have occurred in the absence of the first." *United States v. Keszthelyi*, 308 F.3d 557, 574 (6th Cir. 2002); *see also United States v. Akridge*, 346 F.3d 618, 623 (6th Cir. 2003) (explaining that, "the exclusionary rule is inapplicable, even if the initial search [was] unlawful, as to evidence that inevitably would have been discovered by lawful means" (citation omitted)). Determining whether the discovery of evidence was inevitable requires "some speculation about how events would have unfolded in the absence of the illegal search," but the Court "must keep

13

speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." *Keszthelyi*, 308 F.3d at 574 (internal quotation omitted).

Here, government applied for and obtained a search warrant for the Cedar Bluff Road apartment on September 14, 2022, following the protective sweep. Information learned from the sweep was included in the affidavit in support of the application for the warrant. Thus, the Court must excise the illegally obtained information from the protective sweep from the affidavit and then decide whether the remainder sufficiently supports a finding of probable cause to search. *United States v. Williams*, 656 F. App'x 751, 753–54 (6th Cir. 2016). "Probable cause is defined as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion, that there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (internal citation and quotation marks omitted). In determining whether a supporting affidavit is sufficient, a magistrate judge considers the "totality of the circumstances," and must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . probable cause exists." *Id.* at 740 (citation and quotations marks omitted).

"If the search warrant affidavit 'contains probable cause apart from the improper information, then the warrant is lawful and the independent source doctrine applies, provid[ed] that the officers were not prompted to obtain the warrant by what they observed during the initial entry.'" *United States v. Whipple*, No. 3:20-CR-31-TAV-HBG, 2020 WL 7241058, at *2 (E.D. Tenn. Dec. 9, 2020) (quoting *Jenkins*, 396 F.3d at 758). In evaluating this second prong (i.e., "whether the initial entry prompted officers to obtain a search warrant"), the Court should not give "dispositive effect" to the officer's assertion that law enforcement would have sought the search warrant even without the illegal search. *Id*. at *2. "Instead, where the facts render officer

14

assurances implausible, the independent source doctrine will not apply." *Id*. (internal quotation omitted).

Examining the search warrant here, the parties argued at the hearing which parts of the supporting affidavit must be excised if the Court were to determine that the protective sweep was illegal. Upon review, it appears that only paragraph 32 of the affidavit contains information learned from the illegal protective sweep.[3] The Court finds that even if it excises paragraph 32, the remainder of the affidavit contains information that establishes probable cause to believe that evidence of drug trafficking would be found at the Cedar Bluff Road apartment.

In the affidavit, the agent states that law enforcement had executed a state search warrant at an apartment on South Gallaher View Road, which yielded 50 grams of suspected heroin, a loaded firearm, various drug manufacturing components, and a large amount of currency [Doc. 34-2 p. 3]. Three individuals, including Raymond Williams, whom law enforcement were investigating as part of a DTO, were also found inside the apartment [*Id.*]. The agent then provides details about the operations of the DTO, stemming from a confidential source proven to be reliable and credible, controlled buys, and law enforcement surveillance [*Id.* at 3–13]. In brief, the DTO used rental vehicles to evade law enforcement and would conduct sales of heroin in parking lots of various apartment complexes in Knoxville, including the Metropolitan [*Id.* at pp. 4–11, ¶¶ 3–4, 6–7, 10–13, 19, 21, 23–24, 28]. Law enforcement also learned that the DTO had been operating out of an apartment located in the Windover Apartments complex but then

---

[3] The Government asserted that parts of paragraph 32 include information unrelated to the safety sweep and should be considered by the Court in determining whether there was sufficient probable cause for the search warrant. Specifically, the Government asserts the Court can consider the information that was learned from the apartment complex's management, which was that person listed as the renter was the same fictious name as listed for other apartments associated with this DTO. The Court finds that even excising the entirety of paragraph 32, there is sufficient evidence to support a finding of probable cause.

15

moved operations to Brendon Park Apartments [*Id*. at pp. 7, 10–11, ¶¶ 16, 25, 27]. Law enforcement obtained and executed a search warrant on that apartment on September 14, 2022 [*Id*. at 13, ¶ 30]. Officers found a suspected member of the DTO, a large sum of currency, and a small amount of marijuana [*Id.*]. Just before execution of that search warrant, officers saw Defendant leave the apartment in a burgundy Jeep Cherokee and travel to the Cedar Bluff Road apartment [*Id*. at 13, ¶ 31]. A vehicle tracker that had been placed on that vehicle and others associated with the DTO showed Defendant and others coming and going from the Cedar Bluff Road apartment multiple times per day over the course of the prior two months [*Id*.]. Further, following his arrest outside of the Cedar Bluff Road apartment, from which Defendant was leaving, and while he was being transported, Defendant admitted to having narcotics hidden in his groin area [*Id*. at pp. 13–14, ¶ 33]. Law enforcement seized two ounces of suspected heroin, which were pre-packed into approximate one-gram quantities, consistent with distribution and sale of narcotics [*Id*. at 14, ¶ 33].[4]

Moreover, TFO Strickenberger testified that officers believed they had sufficient probable cause for a search warrant for the Cedar Bluff Road apartment before they conducted the safety sweep, and they had already decided to seek a search warrant before the sweep commenced. The Court credits this uncontested testimony, especially given that much of the information supporting the search warrant was gathered before the protective sweep. *See Whipple*, 2020 WL 721058, at *2 (explaining that the magistrate judge's assessment of an officer's testimony is entitled to deference "because the magistrate judge is in the best possession to observe and determine credibility" (citing *United States v. Vaughn*, 429 F. Supp. 3d 499, 507

---

[4] Defendant argued that the term "TARGET LOCATION" was used in the affidavit to refer to both the Grayland Drive apartment and to the Cedar Bluff Road apartment. While true, when read in context, it is clear to which apartment the reference refers.

(E.D. Tenn. 2019)). Further, one of the officers' reasons for conducting the sweep was to assure officer safety during the execution of the search warrant they were seeking, which supports his testimony that he had already decided to seek a search warrant for the Cedar Bluff Road apartment prior to the sweep. In addition, it is reasonable to believe that it the illegal sweep was not what prompted officers to seek the warrant given law enforcement's prior investigative activity and the heroin found on Defendant as part of his arrest outside of the Cedar Bluff Road apartment, which was obtained independent of the illegal protective sweep.

The Court has reviewed the several cases relied upon by Defendant, but it finds each of them distinguishable. In *United States v. Haddix*, 239 F.3d 766 (6th Cir. 2001), *United States v. Quinney*, 583 F.3d 891 (6th Cir. 2009), and *United States v. Dice*, 200 F.3d 978 (6th Cir. 2000), *abrogated on other grounds by Hudson v. Michigan*, 547 U.S. 586 (2006), law enforcement never secured a valid search warrant independent of facts learned through unlawful activity, as law enforcement did here. *See United States v. Bowden*, 240 F. App'x 56, 63 (6th Cir. 2007) (applying the inevitable-discovery doctrine and distinguishing *Haddix* and *Dice*). In *United States v. Griffin*, 502 F.2d 959 (6th Cir. 1974), "the police *intentionally* took a shortcut to circumvent the warrant requirement—they conducted an illegal search to determine if they should seek a warrant," *United States v. Vanaman*, 12 F. App'x 222, 232 n.1 (6th Cir. 2001), but that was not the case here. And in *United States v. Satterfield*, unlike here, the police did not possess nor were actively pursuing the lawful avenue of discovery when the illegality occurred. 743 F.2d 827 (11th Cir. 1984), *superseded by statute on other gnds as stated in United States v. Edwards*, 728 F.3d 1286, 1292 & n.2 (11th Cir. 2013). Finally, in *United States v. Sciliano*, 578 F.3d 61 (1st Cir. 2009), the First Circuit Court of Appeals affirmed the district court's conclusion

17

that the Government failed to establish officers would have sought a warrant absent discovery during an illegal protective sweep.

For all these reasons, the Court finds the warrant was not prompted by the protective sweep and a neutral magistrate judge would have still issued the warrant without the information obtained from the illegal sweep. In other words, there was an independent source for the evidence that Defendant seeks to suppress and the evidence would have inevitably been discovered. *See United States v. Ray*, 577 F. App'x 526, 533 (6th Cir. 2014) ("The Supreme Court and our circuit have applied the [inevitable discovery] doctrine in several cases where, like this one, a potentially illegal search was followed by a search conducted in accordance with a valid search warrant premised on evidence of probable cause developed independently of the initial search." (citations omitted and alteration in original)).

C.      **Good Faith Exception to the Exclusionary Rule**

To the extent the independent-source doctrine or inevitable-discovery doctrine does not apply in this case, the Government asserts that the officers acted in good faith in relying upon the search warrant for the Cedar Bluff Road apartment. The purpose of excluding evidence obtained in violation of the Fourth Amendment is to deter future Fourth Amendment violations by law enforcement. *Herring v. United* States, 555 U.S. 135, 139–40 (2009) (citing *United States v. Calandra*, 414 U.S. 338, 347–48 (1974) (observing that the exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect")). But "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," then the Supreme Court has said that the exclusionary rule should not apply. *United States v. Leon*, 468 U.S. 897, 920–22 (1984). In other words, if an officer's reliance on the search warrant was "objectively reasonable,"

18

suppressing the evidence seized pursuant to an invalid warrant has no deterrent effect on the officer. *Id.* at 922. In evaluating whether the good faith exception applies, courts ask "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23.

Here, even if there was not probable cause to support the search warrant for the Cedar Bluff Road apartment, the officers executing the warrant were objectively reasonable in executing it. Defendant argues that this cannot be true because there was no warrant for the initial entry into the apartment [Doc. 54 p. 5]. But the good-faith exception can still apply even when a warrant was secured in part on the basis of an illegal search. *See United States v. Rounsaville*, No. 1:17-cr-69-HSM-SKL, 2018 WL 6177963, at *12 (E.D. Tenn. July 27, 2018), *report & recommendation adopted by* 2018 WL 4909903 (E.D. Tenn. Oct. 10, 2018). Furthermore, here, there is no evidence of police misconduct that is "sufficiently deliberate that exclusion can meaningfully deter it, [nor] sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at *13 (citation omitted). Law enforcement had an objectively reasonable, good-faith belief that the search warrant for the Cedar Bluff Road apartment was valid because of their investigative activity prior to and independent of the unlawful protective sweep.

Accordingly, even if the independent-source doctrine or inevitable-discovery doctrine does not apply in this case, the good-faith exception would apply because officers acted in objective good faith in relying upon the warrant to search the Cedar Bluff Road apartment. The evidence obtained from that search, therefore, should not be suppressed.

19

## IV. CONCLUSION

The Court finds that the protective sweep of the Cedar Bluff Road apartment was unreasonable because Defendant was arrested outside the apartment and officers did not have a reasonable belief that someone else was inside the apartment. The Court finds, however, that the search of the apartment was constitutional because the search warrant affidavit contains independent probable cause without considering the evidence from the sweep and law enforcement would have inevitably seized the evidence from the Cedar Bluff Road apartment pursuant to a valid search warrant. In addition, the exclusionary rule does not apply because the executing officers acted in good-faith reliance on the search warrant. Accordingly, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress [**Doc. 34**] be denied.[5]

Respectfully submitted,

_Jill E. McCook_
Jill E. McCook
United States Magistrate Judge

---

[5] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to appeal the District Court's order. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 555 U.S. 1080 (2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). "[T]he district court need not provide *de novo* review where objections [to this report and recommendation] are [f]rivolous, conclusive, or general." *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (internal quotation omitted). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).